7 403
80T 612

## GEORGE LACY *v.* THE STATE.

1. ARREST. — The authority to arrest without warrant is conferred and controlled in this State by statutory provisions, which must be construed in subordination to the constitutional guaranty against unreasonable searches and seizures.

2. Same. — To authorize a peace-officer, or any other person, to make an arrest without a warrant of arrest, two things must concur: *first*, the arrest must be for an offence which the Code classifies either as a felony or an "offence against the public peace;" and, *second*, it must have been committed in the presence or within the view of the officer or person who attempts to make the arrest.

3. Case Stated. — In a trial for murder in B. County, the defence proposed to prove, in effect, that the deceased had stolen a horse in another county, and, while passing through B. County with the horse, was killed by the defendant when the latter was attempting to arrest him without a warrant. *Held*, that the proof was properly excluded, on objection, for irrelevancy; for, though a prosecution for theft may be had in any county to or through which the stolen property is taken, yet the asportation of the property was not a commission of theft "in the presence or within the view" of the accused, so as to authorize him to arrest the deceased without a warrant.

Appeal from the District Court of Bosque.    Tried below before the Hon. J. Abbott.

The indictment charged that Samuel Lacy, and his son, George Lacy, the appellant, did, on April 1, 1877, murder William H. Swank, by shooting him with a gun, in the back, arm, and back of the head. Appellant was alone on trial.

The evidence discloses a somewhat peculiar state of facts. The deceased was an entire stranger to all of the witnesses who saw him in Bosque County, but, by his physical characteristics, clothing, and a singular way of talking, the testimony adduced by the State satisfied the jury that he was the man named in the indictment.

S. J. King, for the State, testified that he was sent for by Samuel Lacy to come to his house, as a man had been killed there. Witness got there between nine and ten o'clock in the forenoon, and found a dead man lying in the yard near a cabin, stretched out on his belly, but lying a little on his left side, with his right arm under him, and an old gray blanket wrapped around his head and shoulders. Sam Lacy said the body lay just as it fell. There were two wounds in the back on the left of the spine, one under the left ear, one above on the left side of the head, one on the

right arm, entering from the rear, and one on the little finger of the left hand. The shots seemed to have entered direct. A six-shooter lay about two feet to the right of the body, with the muzzle towards it. The pistol had made no indentation on the ash-bank it lay upon, though there had been a rain the preceding night. Sam Lacy met witness and told him an unfortunate occurrence had happened there that morning; that about sunrise the man had come to his house on foot, having previously been seen coming out of the brakes, riding one horse and leading another. The man left his horses where they were out of sight from the house, and walked up and asked if he could warm. Being invited in to the fire, he entered and sat down, pulled off his shoes, and after awhile asked if he could get breakfast. Mr. Lacy told him he could, and, while the man sat there and ate his breakfast, asked him where he lived and where he had been, and he said he lived in Coleman County, and had been in Bell County and was going to Coleman County. Lacy told him he was a long way out of the route from Bell to Coleman County. The man said that he was going to Meridian (in Bosque County), and that his name was Wallace. Lacy then said to him, " I will go with you to Meridian; from your appearance, and the manner you come up here, I think there is something wrong with you, and that you have stolen property in your possession." The man said, " Come on, then," and started off in the direction of his horses. Lacy told him to wait until he (Lacy) got ready, and he would go with him to Meridian, and "if you are all right with the authorities you are all right with me." The man did not stop, and Lacy told him a second time to stop; and as the man still went on, got his gun, and for the third time told him to stop. The man then stopped, and Lacy told him to come back and take a seat in the house; that he should not be hurt, but to wait until he (Lacy) got ready, and he would go with him to Meridian. The man came back until he got near the door, and there broke and ran

around the house, and he (Lacy) hobbled along after him, and, while passing the corner of the house, heard a gun fire from the opposite side of the house, and soon found that it was fired by George Lacy, though he (Mr. Lacy) did not know that George was then in the yard. The man's horses were a roan paint pony, with a bald face, and the other a sorrel horse. One of them was hobbled, and to him the other one was necked. They were about two hundred yards from the house, and a saddle was on the rock fence near them.

Other witnesses for the State gave substantially the same version of Samuel Lacy's account of the matter. One, however, added that Lacy said the man got his pistol out as he turned around the house; and another stated that Lacy showed him George Lacy's position when he fired, which was eighty feet from the body, and the two points were not in sight of each other by a foot, — owing, presumably, to the interposition of the house or cabin. This witness was a doctor, and said that the shot in the neck could not have made its exit at the wound in the back of the head, which entered the brain and killed the man; and that a shot in the brain would cause instant contraction of the muscles of the hand upon any thing therein, whereas a shot in the body would relax the muscles, and any thing in the hand would drop therefrom. Another doctor, testifying for the defence, exactly reversed this theory of the muscular effect of such wounds, and said the wound in the back of the deceased's head might have been made by the exit of the shot which entered the side of the neck. The wounds, he said, were not probed.

Among the witnesses for the defence were the mother, sister, and brother-in-law of the appellant, and a cousin of the brother-in-law, each of whom saw and heard more or less of what transpired previous to and at the moment of the homicide. George Lacy, the appellant, had, with one of these witnesses, gone out to examine the horses of the

deceased while the latter was in the house, and returned about the time Samuel Lacy, his father, was endeavoring to detain the deceased. Up to the time the deceased turned the corner of the house, their account of what passed between him and Samuel Lacy accords in substance with the latter's version of it to the State's witnesses. According to their testimony, George Lacy, as the deceased came round the house, stepped into a room and took a gun from a rack, stepped into the door of the room, or into the yard, and as the deceased turned the corner of the house with his pistol presented at George, the latter fired upon him with the gun. Two of the witnesses heard some one exclaim, "The man will kill George." The entire testimony denies, by implication, that any shot was fired except the one by the appellant. Doubtless the practical difficulty encountered by the defence was to explain, by the evidence, how the deceased came to be shot in the back.

The jury found the appellant guilty of murder in the second degree, and assessed his punishment at fifteen years in the penitentiary.

*J. M. Maxcy* and *M. D. Herring*, for the appellant. The court erred in the fifth paragraph of the charge. No complaint is made of the first part of this paragraph; but the whole, taken together, it is submitted, is on the weight of evidence. The charge says "no citizen is authorized by the law to arrest a person on suspicion,— that is, on a bare belief that an offence has been committed,— without a warrant of arrest; such citizen does so on his own responsibility, and is in law bound by the consequences of his own unlawful act."

As to whether or not the attempted arrest was unlawful depended upon a question of fact to be determined by the jury. That the deceased was a horse-thief, and had then a stolen horse in his possession at the time he was killed, and had committed a felony in Bosque County, was a question of fact for the jury. It was a charge upon the weight of

evidence; it was more: it was deciding a question of fact by the court, and upon this is made to depend the question of guilt as charged in the indictment. No judge in any cause, civil or criminal, shall charge the jury on the weight of evidence, or assume particular facts to be proven. *Gray* v. *Burk*, 19 Texas, 228; *Rogers* v. *Broadnax*, 24 Texas, 538; *McFall* v. *Walker*, 25 Texas, 327; *Hunter* v. *Hamilton*, 28 Texas, 560.

It is true that the court excluded the testimony of the witness Messer, offered by the defendant to prove that deceased was a horse-thief, and then had Messer's horse, which he had stolen, in his possession, upon the objection of State's counsel; to which a bill of exceptions was taken, and to which the attention of the court will be called in a subsequent part of this argument. Still, there is sufficient proof in the record to show that the man who was killed at Lacy's house had stolen Messer's horse, and was then in possession of him.

The conduct of deceased showed that he was a horse-thief. The manner of his approach to Lacy's house, leaving the highway a mile from the house and taking to the brakes, and hiding the horses in a hollow where they could not be seen, hobbling the large horse and necking the pony to him; the place where he said he lived, when interrogated by Lacy, to wit, Coleman County, and where he had been, to wit, to Bell County; his name given as Wallace; his attempt to fight out of it and make his escape, and other circumstances, show that he had stolen the horse in Bell County, and having him there in his possession in Bosque County, where it was a felony as well as in Bell County; and Lacy had the right to arrest him without a warrant, because he had and was then committing a felony in Bosque County, and yet the charge upon this point assumes that the attempted arrest was upon "suspicion or bare belief," thereby withdrawing the question from the jury, upon which depended the right to arrest.

The court erred in the ninth paragraph of the charge, because it assumes as a fact proven that the attempted arrest was unlawful, when that fact was for the jury to determine, under proper instructions. Nothing is left for the jury to determine as to the facts which would constitute an unlawful arrest, the facts of which was the very question which ought to have been left to the jury.

The court erred in the charge because it assumes that the defendant provoked a difficulty with the deceased, with the object in view of furnishing him a pretext for taking his life.

There was no proof before the court that the defendant, or either of them, sought or brought on a difficulty, in the sense that the law attaches to it where a party seeks to justify his acts. On the contrary, Lacy was attempting to make an arrest of a felon. The deceased had committed theft of a horse in Bell County, and had stolen property in his possession in Bosque County; it was a felony committed in his presence in the latter county, and a citizen had the right to make the arrest and take him before the proper officer. How can it be said, then, that he brought on a difficulty, or was provoking a difficulty, and seeking to justify by reason of it?

The proof shows that the deceased was attempting to evade an arrest, even to the extent of taking life to effect his escape, as these desperate characters have often done, and have too often succeeded in doing, adding murder to the crime of horse-stealing. The charge was clearly erroneous, and misled the jury to the prejudice of the defendant. No difficulty was sought with the deceased, with the intention of killing him. The killing was not done, as the court seems to take for granted, in an attempt to make an unlawful arrest, but to make an arrest of a felon for a lawful purpose, as reasonably appears from the evidence. These charges were erroneous, and left the jury nothing to do but to find the defendant guilty.

The court erred in refusing to allow the witness Messer to testify in behalf of the defendant, as per bill of exceptions. The facts sought to be proved were proper and competent evidence. · *First*, Because it proved that the deceased was a horse-thief, and had stolen Messer's horse in Bell County on Friday night, before he was found in his possession on Sunday morning thereafter in Bosque County, and which was a felony, which justified the Lacys in attempting to make the arrest and take him before the proper officer. *Second*, It was certainly admissible in rebuttal of the evidence introduced by the State of the proof of the honesty and good character of William M. Swanks, the person alleged to have been killed. The State's witnesses, the two Fairleys and William Swanks, testified that William M. Swanks was an industrious, harmless, and honest man. As the State had put his character in issue, it was certainly competent for the defendant to introduce evidence to rebut the good character of the deceased.

, It is submitted that the exclusion of this testimony was damaging to the defendant, and for this error the cause should be reversed. It was depriving the defendant of important testimony which might have changed the result.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. It is shown by bill of exceptions that the defendant placed on the stand and had sworn a witness by whom he proposed to prove that the witness had had a sorrel horse stolen from his possession and from his residence, in Bell County, on the twenty-ninth day of March, 1877, and that after the first day of April, 1877, the day on which the deceased was killed by the defendant, he, the witness, heard of his horse as having been in the possession of the deceased when he was killed; that the witness came to Bosque County, found his horse, proved his property in the animal, and took it home; and that the defendant would

by other evidence connect the deceased with the theft of the animal; which proof the defendant was not permitted to make, the testimony being ruled out by the court on objection by the State, and the ruling saved by bill of exceptions. The view of the judge in making the ruling is expressed in the eighth paragraph of the general charge to the jury, and which is complained of as being erroneous and upon the weight of the evidence. The paragraph is as follows:—

"You are instructed that any person who has committed a felony (and the theft of a horse is a felony) may be arrested by any citizen under the following circumstances, and no other: Where a felony is committed in the presence of a citizen, or within his view, such citizen may arrest the offender without a warrant of arrest, and he may adopt all the means necessary to effect such arrest which the law authorizes to be adopted by a sheriff or other peace-officer. But no citizen is authorized by law to arrest a person on suspicion,—that is, on the bare belief that an offence has been committed; and if a citizen attempt the arrest of a person on mere suspicion, without a warrant of arrest, such citizen does so on his own responsibility, and in law is bound by the consequences of his unlawful act."

The ninth paragraph of the charge inculcates the same idea of the law of the defence, and instructs the jury as to the legal consequences which follow a homicide committed in an attempt at an illegal arrest.

It is not necessary that we go to the common law or to the decisions of the courts of other States in order to ascertain the circumstances under which a private person or an officer of the law may arrest for crime without warrant, for the reason that in this State the whole subject is regulated by the Constitution and the statute law. By art. 209 of the old Code of Criminal Procedure, and art. 226, Revised Code of Criminal Procedure, it is provided that a peace-officer or any other person may without warrant arrest any offender

when the offence is committed in his presence, or within his view, if the offence is one classed as a felony, or as an "offence against the public peace." This article, and others relating to the subject of arrests, must be construed in harmony with and in subordination to the Bill of Rights, the ninth section of which declares as follows: "The people shall be secure in their persons, houses, papers, and possessions, from all unreasonable seizures or searches, and no warrant to search any place or seize any person or thing shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

Besides art. 226, articles from 227 to 231, inclusive, are on the same subject of arrest without warrant. From the whole tenor of these articles of the Code, it is to our minds apparent that the whole authority given to arrest without warrant is founded in the law of necessity, — a necessity for prompt action in order to arrest or detain the offender, so as to prevent his escape by delaying the time necessary to procure a warrant for his arrest. The whole question here presented depends upon the proper construction and application of art. 226, copied above, and of that portion of the article which is in these words, "When the offence is committed in his presence, or within his view," as applicable to the present inquiry. It is argued with force and ability, but without authorities to support the argument, that horse-stealing is a continuing offence and a felony, and that any citizen who might see a person passing through the country and having an animal of the horse kind in possession, under such circumstances as to awaken suspicion that the animal was stolen, that then it would be within the spirit and meaning of the law which authorizes an arrest without warrant. It is true that when property is stolen in one county and carried off by the offender to another, he may be prosecuted either in the county where he took the property, or in any other county through or into which he may have carried the same (Code Cr. Proc., art. 216); but

this provision is not that a new offence has been committed, but that the offender may be prosecuted either in the county where he took the property, or through or into which he may have carried it. Hence our construction of art. 226 is, that, to entitle either a peace-officer or any other person to arrest without warrant, two things must concur: *first*, that the person sought to be arrested has committed an offence classed as a felony, or as an offence against the public peace; and, *secondly*, that the offence must have been committed in his presence, or within his view; and as to one passing through the country under suspicious circumstances, or even if common rumor had been circulated that a felony had been committed, any person, be he peace-officer or private citizen, who should attempt his arrest without warrant, would be liable to all the consequences resulting from an illegal arrest.

In the case before us there is no pretence that the defendant, or any other person acting with him, was clothed with a warrant for the arrest of the deceased. We are therefore of opinion that the court, in the paragraph of the charge copied above, gave to the jury a charge applicable to the facts proved, and substantially correct in law, and that the testimony excluded was irrelevant and inadmissible under the law, as the testimony developed the defence.

We find no error in the charge to the prejudice of the defendant. The various instructions given to the jury, though perhaps more voluminous than necessary to give the jury the law arising upon the facts proved, are believed to be sufficiently expressed to submit to the jury the material points of inquiry. We cannot say that there was not a sufficient amount of legal testimony to warrant the jury in their finding, either as to the guilt of the defendant or the identity of the person killed with the person named in the indictment.

The sufficiency of the verdict is called in question, and a photographic copy is attached to the transcript; but this is

not identified as any part of the record, so as to entitle it to consideration. There is no objection to the form of the verdict as recorded on the minutes of the court. Verdicts are not subject to strict rules of interpretation; so they are intelligible, the law is satisfied.

After a careful examination of the whole case as made by the record, in the light of able oral argument and brief by counsel for the appellant, we find no such error as required the granting of a new trial in the court below, or as would warrant a reversal of the judgment; and it is affirmed.

*Affirmed.*